# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MITCHELL J. SHERMAN,**

      **Plaintiff,**

      **v.**                                **Case No. 21-CV-1038-SCD**

**CONAGRA FOODS INC.,**

      **Defendant.**

---

## DECISION AND ORDER

---

Three months into a new job at Conagra Foods Inc., Mitchell Sherman underwent a surgery that left them[1] unable to bend, twist, or lift more than ten pounds. Conagra placed Sherman on medical leave immediately after the surgery and assigned Sherman light duty work when they returned a few weeks later. When that work dried up, Conagra placed Sherman on medical leave again. The company discharged Sherman a few weeks later because it believed Sherman was unable to perform the job they were hired for.

Sherman sued Conagra in federal court, alleging that the company discriminated against them on the basis of their sex and disability and retaliated against them for opposing discriminatory treatment. After the court dismissed Sherman's sex discrimination claims, Conagra moved for summary judgment on the remaining disability claims. Conagra also moved for sanctions against Sherman, arguing that the remaining claims are frivolous. Because Sherman has failed to present evidence from which a reasonable factfinder could rule in Sherman's favor on their disability claims, the court will grant Conagra's motion for

---

[1] Sherman's preferred gender pronouns are they, them, and their.

summary judgment. However, the court will deny Conagra's motion for sanctions, as Sherman's claims—while meritless—are not so bases as to be frivolous.

<h2 style="text-align:center">BACKGROUND</h2>

## I.   Factual Background

In October 2019, Conagra Brands, Inc., hired Sherman as a process control technician at its food processing facility in Darien, Wisconsin. *See* Def.'s Proposed Findings of Fact ("Def.'s Facts") ¶¶ 1, 6–7, ECF No. 58.[2] As a process control technician, Sherman was responsible for ensuring the safety and quality of product made at the facility. *Id.* ¶ 11. One of the essential duties and responsibilities of the process control technician position is "checks performed on packaging/processing lines," which the company refers to as "line checks." *Id.* ¶¶ 12, 15–16. Conagra considers line checks to be an essential function of the process control technician position. *Id.* ¶ 19. In fact, the process control technician position exists to perform line checks; no other position at Conagra performs that task as part of its normal job duties. *Id.* ¶¶ 18, 21. Stephanie Craig was a process control technician at the Darien plant at the time Sherman worked there. *See* Craig Decl., ECF No. 61; Malugade Decl. Ex. 6, ECF No. 59-6; Malugade Decl. Ex. 1, at 67[3], ECF No. 59-1. Craig says that, as a process control technician, she spent more than half her time performing line checks. Craig Decl. ¶ 6.

The parties disagree on other aspects of the process control technician position. According to Conagra, process control technicians must bend, twist, and lift more than ten pounds to perform their required jobs duties. Def.'s Facts ¶¶ 22–24. Indeed, the job

---

[2] Sherman did not respond to Conagra's proposed facts or submit their own statement of additional facts. Thus, Conagra's facts are largely undisputed, except where the cited materials do not support the company's assertions.

[3] Citations are to the page numbers of the deposition transcript, not those provided by the court's case management/electronic case files system.

2

description, which Sherman received at the outset of their employment, indicates that process control technicians must be able to occasionally lift up to sixty pounds. *Id.* ¶¶ 13–14. Also, Craig (another process control technician) reported that the position required bending, twisting, and lifting more than ten pounds. *Id.* ¶¶ 22–24 (citing Malugade Decl. Ex. 6); *see also* Craig Decl. ¶¶ 6–14. Sherman, however, insists that they rarely lifted anything more than ten pounds and that the position didn't require much bending or twisting. *See* Ex. 1, at 53–58, 69–70, 81, 95–96, 130–31.

Sherman alleges that they were harassed by Paula Moore (Sherman's boss's boss) shortly after Sherman began their employment. *See* Def.'s Facts ¶¶ 90–93 The first incident occurred in November 2019, when Sherman used a walkie talkie to call maintenance while on the production floor. *See* Ex. 1, at 181–84. Sherman says that Moore told Sherman that calling maintenance wasn't their responsibility, that Sherman was too animated during the call, and that Sherman needed to tone it down. Sherman told Moore their behavior likely was attributable to their ADHD. A few weeks later, in early December, Sherman failed to perform a check on microbiology line—a task for which Sherman says they never received training. *See id.* at 149–51, 173–74. Moore reportedly said to Sherman: "How stupid do you have to be?" "What kind of a retard does it take?" "You should know this." "I thought we hired smarter people." *Id.* at 149. Although Moore did not say anything about Sherman's ADHD— or any of Sherman's other medical issues—Sherman believed her comments related to how Sherman's ADHD was perceived (i.e., that Sherman was mentally slow or overly energetic). The following month, in January 2020, Sherman didn't sign off on a sanitation certification because, in Sherman's mind, the line hadn't been fully cleaned. *Id.* at 163–67, 169–71. Sherman says that Moore tried to bully them into signing the certification and, when Sherman

3

refused, Moore had someone else sign it and told Sherman they couldn't perform those checks until they were re-trained.

Around that same time, Sherman informed their boss, Jason Pekul, about certain training issues. Def.'s Facts ¶¶ 39–40, 93. Sherman had received extensive training early in their employment, as shown in Conagra's detailed training records. *Id.* ¶¶ 37–38 (citing Malugade Decl. Ex. 7, ECF No. 59-7). Despite that extensive training, Sherman told Pekul that Sherman still needed to be trained in several areas and that Moore said Sherman needed to be re-trained in others. *See* Ex. 1, at 170–74. While Sherman was not formally disciplined or written up for any training deficiencies, Def.'s Facts ¶ 42, Sherman says they were admonished in the workplace, and Sherman believes that mistakes made due to lack of training prevented them from being considered for other roles within the company, Ex. 1, at 179–80, 186. Sherman also assumes that the other process control technicians had been fully and properly trained; however, Sherman cannot identify any other process control technician who received more training than Sherman. Def.'s Facts ¶¶ 43–45. Conagra says that Sherman received the same training as the other process control technicians. *Id.* ¶ 46.

During a supervisor review in early 2020, Sherman complained about Moore's treatment. Def.'s Facts ¶ 96. Specifically, Sherman told HR about the walkie talkie incident, Moore's allegedly disparaging comments, the certification issue, and the deficient training. *See* Ex. 1, at 168–74. Sherman, however, says that the only time Moore commented about Sherman's intelligence or other medical issues was during the walkie talkie and microbiology line incidents. Def.'s Facts ¶¶ 98–99; *see also* Ex. 1, at 149–51, 160, 182–83. Sherman also says that Moore harassed others, too, including Pekul (who is not disabled). Def.'s Facts ¶¶ 101–

4

02. Moreover, Sherman believed the primary reason Moore treated Sherman poorly was because Sherman refused to sign the sanitation certification. *Id.* ¶ 97.

In late January 2020, Sherman underwent colon resection surgery. *See* Ex. 1, at 81, 111. Sherman requested two weeks off work to recover, which Conagra granted even though Sherman had not been there long enough to accumulate any time off. Def.'s Facts ¶¶ 47–49. Sherman returned to work on February 14, 2020, with a doctor note indicating that Sherman could work "for up to . . . 4 hours a day, up to 5 days a week with the following restrictions: No lifting more than 10#, no bending or twisting." *Id.* ¶¶ 50–52; *see also* Malugade Decl. Ex. 9, at 2–3, ECF No. 59-9. The note also indicated that Sherman needed to have a phone on his person for emergencies. Conagra provided Sherman light duty work within those restrictions. Def.'s Facts ¶ 54. Sherman's restrictions were updated a few weeks later to allow "up to . . . 6 hours a day as tolerated." *Id.* ¶¶ 56–57 (citing Ex. 9, at 4). Sherman continued with light duty work. *Id.* ¶ 58.

On March 2, 2020, Conagra placed Sherman on unpaid medical leave because the company determined that there was no work available within Sherman's medical restrictions. Def.'s Facts ¶¶ 59–60. Those restrictions continued until March 31, 2020, when Sherman's spine doctor removed the cell phone requirement. *See id.* ¶¶ 61–64; Ex. 9, at 5–6. Sherman returned to work on April 15, 2020, performing light duties in the HR department. Def.'s Facts ¶¶ 65–68. A few days later, the plant shut down due to COVID-19. *Id.* ¶¶ 69–70.

In early May 2020, Sherman underwent another surgery to address digestive issues. Def.'s Facts ¶ 71. Conagra provided Sherman another leave of absence for recovery even though Sherman still did not have any time off available. *Id.* ¶¶ 72–73. (By that time the plant had reopened. *See* Ex. 1, at 72.) On June 18, 2020, Sherman informed Conagra of their new

5

medical restrictions, which indicated that Sherman could "return to work 6/18/2020 for up to 4 hours/day as tolerated, 5 days/week. No lifting more than 10#, no bending or twisting." Def.'s Facts ¶¶ 106–07; Ex. 9, at 7. Sherman, however, did not return to work, and they were fired on July 27, 2020. Def.'s Facts ¶ 109. Conagra says the company terminated Sherman's employment because there was no work available within Sherman's medical restrictions, no reasonable accommodations had been identified that would allow Sherman to work, and it was unclear when—or if—Sherman would ever be able to perform the essential functions of any available job at Conagra. *Id.* ¶¶ 108, 110.

Prior to being fired, Sherman had requested several accommodations for their medical issues. *See* Def.'s Facts ¶¶ 75–76. Sherman first asked to return to the process control technician position and have another employee assist with any lifting or twisting needs, pointing out that the position already required two individuals for certain tasks. Ex. 1, at 55–71, 95–96, 128–39. However, according to Sherman, HR said Moore wanted Sherman to be 100% healthy before returning to the quality assurance department. *Id.* at 56, 130, 144. Sherman also requested transfer to a forklift position, claiming they were certified and had prior forklift experience. *Id.* at 120–23. Sherman believes Conagra was hiring forklift drivers at the time they requested the transfer. Finally, Sherman asked to carry a cell phone while on the production floor in case of an emergency. *Id.* at 56–57.

Conagra did not adopt any of Sherman's proposed accommodations. The company told Sherman the process control technician position wasn't an option because it required bending, twisting, and lifting more than ten pounds. *See* Malugade Decl. Ex. 11, at 2, ECF No. 59-11. And, according to Conagra, having a helper employee wasn't feasible because the company did not require process control technicians to work in pairs and each process control

6

technician—only three to five worked on a shift—was responsible for separately checking three to four lines every four hours. Def.'s Facts ¶¶ 78–81. As for the forklift job, Conagra told Sherman that a position needed to be available and that Sherman had to pass a written and driving test. Ex. 11, at 2. Because Sherman never returned to the production floor, the cell phone request was a non-issue. Def.'s Facts ¶ 89.

Also prior to being fired, Sherman had applied for disability insurance benefits from the Social Security Administration. *See* Ex. 1, at 89–90. Sherman first applied in 2015 and reapplied shortly after the January 2020 surgery. In the latest application, Sherman indicated that their medical restrictions prohibited them from doing their prior job tasks and that they were unable to drive due to their condition and medication side effects. *See* Def.'s Facts ¶¶ 120–21, 125–27; *see also* Ex. 1, at 89–103. As part of the disability application, Sherman submitted treatment notes indicating that Sherman requested work excuses and restrictions due to various issues, including an inability to twist, turn, and bend; fatigue and back pain; and an inability to perform any work due to medications and physical limitations. Def.'s Facts ¶¶ 122–24. Notwithstanding the disability application, Sherman says they could have worked at that time if Conagra had provided a reasonable accommodation. *Id.* ¶¶ 129–30; *see also* Ex. 1, at 92–96. In other words, Sherman says the disability application reflected what Conagra was telling Sherman: that they were unable to perform their job due to their restrictions. The Social Security Administration ultimately found Sherman disabled based on Crohn's disease, spine disorders, ADHD, and anxiety. Def.'s Facts ¶ 119; *see also* Malugade Decl. Ex. 16, ECF No. 59-16.

7

## II.     Procedural background

Proceeding without the assistance of counsel, in September 2021, Sherman filed an employment discrimination complaint against Conagra in federal court. *See* Compl., ECF No. 1. The clerk of court randomly assigned the matter to me, and all parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 5, 15. Sherman subsequently filed an amended complaint alleging that Conagra discriminated against them based on their sex and disability and retaliated for opposing discriminatory treatment. *See* Am. Compl., ECF No. 24. After I granted Conagra's motion to dismiss several claims, *see* Decision & Order, ECF No. 36, Sherman found a lawyer, and the case proceeded to discovery.

On March 1, 2024, Conagra filed a motion for summary judgment on the remaining claims, ECF No. 56, and a motion for sanctions against Sherman and Sherman's lawyer, ECF No. 62. In response, Sherman's lawyer moved to withdraw as counsel; I granted the motion and denied Sherman's request for appointed counsel. *See* Order, ECF No. 69. Once again without a lawyer, Sherman filed a response to the motions, ECF No. 72; an exhibit of "evidentiary" documents, ECF No. 72-1; and a supplemental response, ECF No. 77. Conagra filed a combined reply in support of both motions. ECF No. 80.

## MOTION FOR SUMMARY JUDGMENT

Conagra seeks summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To determine whether a genuine issue of material fact exists, I must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255).

Sherman alleges that Conagra violated their rights under Title I of the Americans with Disabilities Act, 42 U.S.C. §§ 12111–12117, in three ways: (I) failing to accommodate Sherman's disability, (II) subjecting Sherman to a hostile work environment based on Sherman's disability, and (III) engaging in disability-based retaliation.[4] Conagra has moved for summary judgment on each of Sherman's ADA claims.

## I.      Conagra Is Entitled to Summary Judgment on Sherman's Failure to Accommodate Claim

"The ADA prohibits employers from discriminating against qualified individuals due to a disability." *Rowlands v. UPS*, 901 F.3d 792, 798 (7th Cir. 2018) (citing *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241 (7th Cir. 2018)). "Discrimination under the ADA includes failing to make reasonable accommodations to a qualified employee's disability." *Id.* "A 'qualified individual' is one 'who, with or without reasonable accommodation, can perform the essential functions of the employment position.'" *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020) (quoting 42 U.S.C. § 12111(8)). As such, an ADA failure to accommodate

---

[4] To the extent that Sherman intended to allege a disparate treatment claim under the ADA, that claim fails for the same reasons Sherman's other claims fail.

claim has three elements: (1) the plaintiff is a qualified individual with a disability; (2) the employer was aware of the plaintiff's disability; and (3) the employer failed to reasonably accommodate the plaintiff's disability. *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013) (citing *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747–48 (7th Cir. 2011)). "To survive a motion for summary judgment, a plaintiff must present the court with evidence that, if believed by a trier of fact, would establish all three elements of his claim." *Id.*

Conagra concedes, for purposes of its motion, that Sherman has a disability. Nevertheless, Conagra contends that Sherman cannot establish that they were a qualified individual with a disability or that the company failed to reasonably accommodate their disability.

### A.    Essential functions

Conagra first argues that lifting and performing line checks on the assembly line are essential functions of the process control technician position. Essential functions are "the fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). "A job function may be considered essential for any of several reasons, including but not limited to . . . because the reason the position exists is to perform that function" or "because of the limited number of employees available among whom the performance of that job function can be distributed." 29 C.F.R. § 1630.2(n)(2)(i)–(ii). "To determine whether a job function is essential, [courts] look to the employer's judgment, written job descriptions, the amount of time spent on the function, and the experience of those who previously or currently hold the position." *Rooney v. Koch Air, LLC*, 410 F.3d 376, 382 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(n)(3)); *Basith v. Cook County*, 241 F.3d 919, 927 (7th Cir. 2001)). Courts "usually do not 'second-guess the employer's judgment

in describing the essential requirements for the job.'" *Tonyan*, 966 F.3d at 687–88 (quoting *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998)).

Here, the undisputed evidence shows that lifting and performing line checks are fundamental jobs duties of the process control technician position. The company clearly believed that to be true. When Sherman first returned to work in February 2020, Conagra assigned Sherman light duty work because the company believed Sherman couldn't perform the process control technician position with their restrictions. Conagra also explicitly told Sherman that the position required bending, twisting, and lifting more than ten pounds. *See, e.g.*, Ex. 11, at 2. And, according to Conagra, one of the reasons the position exists is to perform line checks, process control technicians perform those checks repeatedly throughout their shifts, and no other position at the company performs them.

Other evidence reinforces the company's judgment. For example, the job description Conagra gave Sherman during the hiring process indicates that process control technicians "[m]ust be able to lift up to 60 lbs. on an occasional basis." Ex. 5, at 3. The job description also lists the essential duties and responsibilities of the position, the first of which is "Checks Performed on packaging/processing lines." *Id.* Finally, Stephanie Craig, another process control technician at the time Sherman worked at Conagra, said she spent more than half her time performing line checks and that the checks required bending, twisting, and lifting more than ten pounds. *See* Craig Decl. ¶¶ 6–14.

Sherman argues that lifting was not essential. As support, he points to a different job description for the process control technician position and a training document that do not explicitly mention lifting. *See* Pl.'s Suppl. 2, 34, 36. While it's true that the second job description does not say anything about lifting, Sherman does not dispute that the description

11

provided to them says process control technicians must be able to occasionally lift up to sixty pounds. *See id.* at 32. Moreover, both job descriptions list line checks as a core duty, and the undisputed evidence shows that those checks require lifting more than ten pounds (as well as bending and twisting). Sherman also acknowledged during their deposition that some bending, twisting, and lifting was required, *see* Ex. 1, at 53–58, 69–70, 81, 95–96, 130–31. *Peters v. City of Mauston*, 311 F.3d 835, 845 (7th Cir. 2002) ("Even [the plaintiff] admits that heavy lifting is required at times, and his argument that such lifting is infrequent does not preclude it from being an essential function of the job."). Accordingly, no reasonable jury could find that bending, twisting, and lifting more than ten pounds were not essential functions of the process control technician position.

## B. Ability to perform essential functions

Conagra also argues that Sherman couldn't perform the essential functions of the process control technician position with or without a reasonable accommodation. The company notes that, after Sherman returned following their first surgery, Sherman's doctors prohibited them from lifting more the ten pounds, bending, and twisting. The company also notes that Sherman applied for social security disability insurance (SSDI) benefits claiming that they were unable to perform their past work at the same time Sherman claimed they *could* return to work at Conagra. According to Conagra, Sherman's representations to the Social Security Administration bar Sherman from pleading and proving that they were able to perform the essential functions of the process control technician position.

### 1. Disability benefits

When Sherman sought disability benefits in February 2020, Sherman represented to the Social Security Administration that they couldn't perform the job tasks of the process

control technician position. That representation, which the agency ultimately found to be true in awarding Sherman benefits, appears to conflict with an element of Sherman's failure to accommodate claim—that Sherman could perform the essential functions of their past work with or without reasonable accommodation. *See Lee v. City of Salem*, 259 F.3d 667, 672–73 (7th Cir. 2001). Although the pursuit and receipt of disability benefits does not estop the recipient from pursuing an ADA claim or trigger a presumption that the recipient is unable to perform the essential functions of her job, "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 802–06 (1999). "Rather, she must proffer a sufficient explanation." *Id.* at 806. "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Lee*, 259 F.3d at 674 (citing *Cleveland*, 526 U.S. at 807).

The same day Sherman returned to work following the first surgery, they told the Social Security Administration, "My restrictions prohibit me from doing my prior job tasks." Malugade Decl. Ex. 17, at 7, ECF No. 59-17. Notwithstanding that statement, Sherman insists that they could have performed the essential functions of the process control technician position with or without accommodations. Sherman says that, when they told the Social Security Administration that their restrictions prohibited them from doing their job tasks, Sherman was merely parroting what Conagra was telling them—that Sherman couldn't perform their job due to their restrictions. *See* Pl.'s Resp. 4; *see also* Ex. 1, at 95–96. Sherman

13

indicates they disagreed with the company's assessment and asserts they later obtained an internship and found a full-time job that worked with Sherman's disability.

Sherman's explanation is insufficient to establish a fact question as to their ability to continue working as a process control technician. When applying for disability benefits, Sherman swore that their statements were truthful and did not attempt to qualify their statements in any way. Sherman also submitted medical records in support of their disability application reflecting that it was Sherman's belief they could no longer work, not Conagra's. Sherman first asked for an excuse from work for the days leading up to the January 2020 colon resection surgery. *See* Malugade Decl. Ex. 18, at 9, ECF No. 59-18. Despite "recovering well from . . . surgery," on March 18, 2020, Sherman asked for a note saying that they couldn't return to work due to an inability to twist, turn, and bend. *Id.* at 14. A few days later, after surgery removed the restrictions, Sherman told the GI clinic that they didn't feel like they could return to work due to fatigue and back pain. *Id.* at 19. And in May 2020, Sherman asked for another work excuse, claiming they weren't capable of any work—including telework—due to their medications and physical limitations. *Id.* at 32. Those contemporaneous factual statements contradict Sherman's deposition testimony that they could have returned to the process control technician position. *See Lee*, 259 F.3d at 674 n.3 (noting that *Cleveland* left undisturbed precedent involving "straightforward, factual representations").

Sherman's explanation fails for another reason: it requires the court (or the potential factfinder) to disregard Sherman's statements to the Social Security Administration as *un*true. Sherman essentially is saying that they applied for disability benefits not because they were disabled, but rather because Sherman's employer said they were. That explanation, however, does not turn on the distinctions between the ADA and a finding of disability under the Social

14

Security Act. Thus, Sherman's representations to the Social Security Administration and statements to treatment providers negate an essential element of their prima facia case under the ADA—Sherman's ability to perform the essential functions of the process control technician position. *See Lee*, 259 F.3d at 675–78 (finding explanation insufficient under *Cleveland* where the plaintiff said he applied for SSDI benefits because his disability had been hammered into his head by his former employer).

## 2. With or without reasonable accommodation

To the extent Sherman attempts to qualify their prior statements—for example, by suggesting that Sherman could have returned to their prior job if Conagra had accommodated them—Sherman still hasn't produced any evidence from which a reasonable jury could find that Sherman was able to perform the essential functions of the process control technician position. At times, Sherman suggests that they could have returned to that role without *any* accommodations. However, the undisputed evidence establishes that lifting, bending, and twisting are fundamental job duties of the position, and from the time Sherman returned to work in February 2020 until when Sherman was fired in July 2020, Sherman's doctors prohibited them from lifting more the ten pounds, bending, and twisting. *See* Ex. 9. Sherman says their condition improved and declined throughout 2020, but Sherman cannot identify any period prior to their termination when their condition would have allowed them to lift, bend, and twist.

Sherman's attempts to minimize their work restrictions are unavailing. Sherman insisted during their deposition that there was no separate restriction for bending or twisting; rather, according to Sherman, the restriction was limited to bending and twisting *with* ten pounds. *See* Ex. 1, at 131. The plain language of the doctor notes—each of which said, "No

15

lifting more than 10#, no bending or twisting," Ex. 9—refutes that belief. Indeed, it appears the doctors included the separate bending/twisting restriction to accommodate Sherman's reports that they couldn't perform the twisting, turning, or bending required for their job. *See* Ex. 18, at 14, 19. Sherman also insisted during the deposition that they could have returned to work in early June 2020, when their restrictions "were fully lifted from a surgical standpoint." Ex. 1, at 88. But on June 18, 2020, Sherman's spine doctor indicated that Sherman couldn't lift more than ten pounds, bend, or twist, and that those restrictions were to remain in place until August 2020. Ex. 9, at 7. Thus, assuming Sherman no longer had any surgical limitations at the time, other restrictions prevented them performing the essential functions of the process control technician position without accommodation.

Sherman also accuses Conagra of not engaging in the interactive accommodation exploration process required by the ADA. Although "an employee's request for an accommodation requires the employer to engage in a flexible, interactive process to identify a reasonable accommodation . . . , the failure to engage in the interactive process required by the ADA is not an independent basis for liability under the statute." *Basden v. Prof'l Trans., Inc.*, 714 F.3d 1034, 1038–39 (7th Cir. 2013) (citations omitted). "[T]hat failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual." *Id.* at 1039. "A 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position.'" *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (quoting § 12111(8)). The ADA lists several examples of reasonable accommodations, including "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or

16

policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." *Id.* (quoting 42 U.S.C. § 12111(9)).

Here, the undisputed evidence shows that Conagra engaged in the interactive process and provided Sherman several reasonable accommodations. The company provided Sherman two leaves of absence even though Sherman had not yet earned any time off. The company also assigned Sherman light duty work when it was available, including in areas outside the quality assurance department where Sherman normally worked. The ADA did not require Conagra to create a permanent light duty position for Sherman. *See Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010) (citing *Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002)).

Sherman contends that Conagra wouldn't allow them to return to the quality assurance department until they were completely healthy and without any restrictions. However, Sherman offers no evidence to support that contention other than their own self-serving statement. The contemporaneous evidence in the record shows that Conagra was willing to work with Sherman's limitations but that there was no work available in the quality assurance department that Sherman could perform with their restrictions. *See, e.g.*, Malugade Decl. Ex. 10, at 3, ECF No. 59-10 (email discussing potential work on the manufacturing floor but not in the quality assurance department); Ex. 11, at 2 (email explaining to Sherman that the process control technician position cannot be performed with Sherman's restrictions); Malugade Decl. Ex. 15, ECF No. 59-15 (emails discussing the company's accommodation efforts); Pl.'s Resp. Ex. A, at 69 ("We could not accommodate his restrictions in QA, because there wasn't enough to keep him busy and we were not going to invent work for him.").

17

The ADA did not require Conagra to adopt Sherman's other proposed accommodations, as each one was unreasonable. Sherman suggested that another employee could have helped assist with lifting. As support, he cites the statement of Stephanie Craig (another process control technician) that a person with a ten-pound lifting restriction may be able to obtain assistance from other employees. *See* Ex. 6. Craig's statement, however, doesn't help Sherman for several reasons: it's not binding on Conagra, it doesn't address Sherman's bending and twisting restrictions, and it's unreasonable as a matter of law. *See Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013) ("The accommodation [the plaintiff] seeks— another person to perform an essential function of the job she wants—is, as a matter of law, not reasonable."); *Peters*, 311 F.3d at 845–46 (finding plaintiff's request that another employee do the heaviest lifting for him was "unreasonable because it requires another person to perform an essential function of [the plaintiff's] job").

Sherman points out that process control technicians did sometimes need help from other employees to perform certain tasks like metal detector checks. That's true. *See* Pl.'s Suppl. 25–30. But the fact that metal detector tests required two people does not establish that process control technicians worked in pairs or regularly reassigned tasks among themselves. *Cf. Miller v. Ill. DOT*, 643 F.3d 190, 199–200 (7th Cir. 2011) (reversing summary judgment for employer where evidence showed that members of the employee's crew regularly substituted and reassigned tasks among themselves). Nor does it address the feasibility of having another employee assist with lifting, especially considering the undisputed evidence that each process control technician is responsible for monitoring three to four lines at a time. In other words, another process control technician would be neglecting her own duties to perform Sherman's; that is not a reasonable accommodation.

18

Sherman also requested to be transferred to another position within the company, as a forklift driver or a line lead. Although reassignment to a vacant position may be a reasonable accommodation under certain circumstances, Sherman bears the burden "to prove that there were, in fact, vacant positions available at the time of [their] termination." *Severson*, 872 F.3d at 482 (citing *Kotwica*, 637 F.3d at 750). Sherman speculates but offers no evidence to support that there were vacant forklift or line lead positions available prior to Sherman's termination. Moreover, when Sherman first requested transfer to the forklift position, Conagra accommodated Sherman's alleged disability by providing light duty work and a leave of absence; the ADA did not require Conagra to provide Sherman their preferred accommodation. *See Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir. 1996) ("An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation."). Sherman also fails to establish that they could have performed the essential functions of the forklift position. Although Sherman may have been qualified to operate a forklift, Sherman told the Social Security Administration that they couldn't drive at that time due to their condition and medication side effects. *See* Ex. 1, at 89–103. Sherman suggests—again without any evidentiary support—that perhaps their medications could have been altered to allow operation of a forklift. Wishful thinking, however, is not a reasonable accommodation.

Finally, Sherman asked Conagra if they could carry a cell phone while on the production floor in case of a medical emergency. That proposed accommodation is moot, however, because Sherman has failed to demonstrate that they could have returned to the production floor as a process control technician position. Also, the cell phone accommodation

wouldn't have addressed Sherman's lifting, bending, or twisting restriction. And Sherman's doctor removed that restriction as of late March 2020. *See* Ex. 9, at 6.

*    *    *

In sum, Sherman has failed to present the court with evidence that, if believed by a trier of fact, would establish that Sherman was a qualified individual with a disability. The undisputed evidence in the record shows that Sherman could not perform the essential functions of the process control technician position with or without a reasonable accommodation. Thus, Conagra is entitled to summary judgment on Sherman's failure to accommodate claim.

## II. Conagra Is Entitled to Summary Judgment on Sherman's Hostile Work Environment Claim

"[H]ostile work environment claims are cognizable under the ADA." *Ford v. Marion Cty. Sheriff's Office*, 942 F.3d 839, 851 (7th Cir. 2019). "The same standard governs hostile work environment claims under the ADA as under other employment discrimination laws." *Id.* at 856. To survive summary judgment, Sherman "must present evidence that: '(1) they were subject to unwelcome harassment; (2) the harassment was based on their [disability]; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability.'" *Id.* (quoting *Johnson v. Advocate Health & Hosps. Corp.,* 892 F.3d 887, 900 (7th Cir. 2018)).

Sherman's hostile work environment claim focuses on the conduct of one alleged bad actor: Paula Moore (Sherman's boss's boss). Sherman offers evidence of three specific incidents of alleged unwelcome harassment by Moore. In November 2019, Moore admonished Sherman for using a walkie talkie to call maintenance while on the production floor, telling Sherman that calling maintenance wasn't their responsibility, that Sherman was

20

too animated during the call, and that Sherman needed to tone it down. Sherman says they told Moore at the time that their behavior likely was a symptom of their ADHD. The second incident occurred in early December 2019 after Sherman failed to perform a check on a microbiology line. Moore reportedly said to Sherman: "How stupid do you have to be?" "What kind of a retard does it take?"; "You should know this."; and "I thought we hired smarter people." Finally, in January 2020, Moore became agitated when Sherman refused to sign a sanitation certification. Sherman says that Moore disciplined Sherman with workplace reprimands, denied Sherman training or required Sherman to receive additional training, refused to offer Sherman work in the quality assurance department while Sherman's restrictions were in place, and interfered with Sherman's ability to obtain a promotion.

Sherman has failed to present evidence that Moore's allegedly harassing behavior was "based on" Sherman's ADHD disability. The walkie talkie incident occurred before Moore was even aware Sherman had ADHD, so it could not have been based on Sherman's disability. Sherman believed that Moore's comments about being stupid, retarded, and the like related to their ADHD disability. However, Moore never made any comments about Sherman's ADHD, and the record contains no objective evidence that a reasonable person in Sherman's shoes would have interpreted Moore's comments that way. Other courts have rejected ADA hostile work environment claims involving similar comments and ADHD. *See, e.g.*, *Tomlinson v. Roundy's Supermarkets*, Nos. 07-C-223 & 07-C-732, 2008 WL 11343661, 2008 U.S. Dist. LEXIS 138065, at *33–36 (E.D. Wis. Dec. 12, 2008); *Umberger v. City of Peoria*, No. 19-cv-1045-JES-JEH, 2022 WL 193597, 2022 U.S. Dist. LEXIS 11277, at *48–53 (C.D. Ill. Jan. 21, 2022); *Ayala v. PayPal, Inc.*, No. 8:16CV57, 2017 WL 2484171, 2017 U.S. Dist. LEXIS 88071,

21

at *13–17 (D. Neb. June 8, 2017). Sherman presents no evidence whatsoever linking the certification incident to their ADHD.

Moreover, Sherman concedes "that Moore treated several others in the same discriminatory manner, *irrespective of their disability status.*" Pl.'s Resp. 10–11 (emphasis added). Sherman named one other person during their deposition—Sherman's boss, Jason Pekul. But there's no evidence Pekul was disabled. The fact that Moore treated other, non-disabled employees in the same discriminatory manner as she treated Sherman suggests that her treatment of Sherman was not based on Sherman's disability.

Moore's alleged conduct also is not so severe or pervasive to have altered the conditions of Sherman's employment. When determining whether a work environment is hostile, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hambrick v. Kijakazi*, 79 F.4th 835, 842–43 (7th Cir. 2023) (quoting *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). Sherman's complaints relate to a few isolated comments Moore made to Sherman over the course of several weeks. However, "having supervisors who are 'short tempered, hostile, unfairly critical, and disrespectful,' does not amount to 'objectively offensive, severe, or pervasive' conduct." *Id.* at 843 (quoting *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018)). The undisputed evidence shows that Sherman was never written up or formally disciplined for any of three incidents described above or the alleged training issues, Sherman does not identify any work within the quality assurance department that Sherman could have performed with their restrictions, and Sherman merely speculates that Moore denied Sherman the chance of a promotion. (Sherman never alleges that they actually applied for a

22

promotion.) Also, Sherman acknowledged during their deposition that Moore's maltreatment primarily stemmed from Sherman's refusal to sign the sanitation certification, which had nothing to do with Sherman's ADHD. *See* Ex. 1, at 163–68.

Because Sherman has failed to present evidence that they suffered severe or pervasive harassing workplace conduct on account of their disability, Conagra is entitled to summary judgment on Sherman's hostile work environment.

### III. Conagra Is Entitled to Summary Judgment on Sherman's Retaliation Claim

"The ADA also prohibits retaliating against individuals (qualified or not) who have engaged in activities protected by the ADA." *Rowlands*, 901 F.3d at 798 (citing *Rodrigo*, 879 F.3d at 243). "To defeat summary judgment on a claim of retaliation under the ADA, a plaintiff must show: (1) statutorily protected activity; (2) an adverse employment action; and (3) a causal connection between the protected activity and the adverse action." *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1055 (7th Cir. 2024) (citing *Trahanas v. Nw. Univ.*, 64 F.4th 842, 856 (7th Cir. 2023)). A plaintiff engages in protected activity under the ADA when he asserts his rights under the Act "by either seeking an accommodation or raising a claim of discrimination due to his disability." *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814–15 (7th Cir. 2015). "[A]n employer's action is adverse if 'the action would have dissuaded a reasonable worker from engaging in protected activity.'" *Trahanas*, 64 F.4th at 856 (quoting *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901–02 (7th Cir. 2018)). Finally, an ADA retaliation claim requires but-for causation. *See Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 936 (7th Cir. 2022) (citing *Kotaska v. Fed. Express Corp.*, 966 F.3d 624, 632 (7th Cir. 2020)).

Sherman alleges that Conagra unlawfully retaliated against them by denying Sherman training, imposing additional training, refusing to allow Sherman to return to the quality

assurance department, and terminating Sherman's employment. According to Sherman, this alleged retaliatory conduct stemmed from Sherman's refusal to sign the sanitation certification, Sherman's complaint to HR about Moore's treatment, and Sherman's requests for accommodations. The undisputed evidence shows that Sherman's refusal to sign the certification and alleged training issues had nothing to do with Sherman's alleged disability and thus do not constitute statutorily protected activity. The evidence also shows that Sherman did not suffer any adverse employment consequences from the alleged training issues. And Conagra's alleged refusal to allow Sherman to return to work is really a failure-to-accommodate claim, not a retaliation claim. *See Rodrigo*, 879 F.3d at 243 (finding that an ADA plaintiff "may not make an end-run around the 'qualified individual' requirement by simply reframing a discrimination or accommodation claim as one for retaliation").

Nevertheless, Sherman has satisfied the first two elements of their ADA retaliation claim. Sherman engaged in protected activity when they requested an accommodation for their disability and perhaps when they complained to HR about Moore's treatment.[5] *See Preddie*, 799 F.3d at 814–15 (explaining that protected activity includes seeking an accommodation and complaining about discriminatory acts). Sherman also suffered an adverse employment action when Conagra fired Sherman. *See Trahanas*, 64 F.4th at 856 ("Termination no doubt qualifies as an adverse action."). Thus, the issue is whether a causal link exists between Sherman's protected activity and their termination.

"In deciding whether there is a genuine issue of material fact as to whether a plaintiff's protected activity caused her termination, [courts] must 'consider the evidence as a whole and

---

[5] It's unclear from Sherman's deposition testimony whether the HR complaint specifically mentioned Sherman's disability. *See* Ex. 1, at 168–71.

ask whether a reasonable jury could draw an inference of retaliation.'" *Parker*, 39 F.4th at 936–37 (quoting *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017)). Sherman does not present any direct evidence of retaliation—that is, an admission that Conagra fired Sherman for requesting accommodations or for complaining about Moore. *See Rowlands*, 901 F.3d at 802. Thus, Sherman must rely on circumstantial evidence of causation, which includes "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Parker*, 39 F.4th at 937 (quoting *Rowlands*, 901 F.3d at 802).

Sherman presents no evidence to suggest that their internal complaint about Moore—to the extent that complaint constitutes "protected activity"—caused Sherman's discharge. Sherman told HR about Moore's conduct in early 2020, and Sherman wasn't fired until July 2020. In the meantime, Sherman continued to work for Conagra with their restrictions when such work was available. That sequence of events does not raise an inference of causation. Moreover, there's no evidence that the person who made the termination decision was aware of Sherman's internal complaint. *See Kotaska*, 966 F.3d at 633 ("A valid retaliation claim requires that the decisionmaker know of the protected activity."). Sherman couldn't recall the name of the HR person they reported to, *see* Ex. 1, at 168–70, and the Moore complaint is not referenced in any internal emails discussing Sherman's termination, *see* Ex. 15.

The evidence presented also would not permit a reasonable factfinder to conclude that Conagra fired Sherman for requesting accommodations for Sherman's alleged disability. The undisputed evidence shows that, when Sherman had surgery in early 2020, Conagra

25

accommodated Sherman's return-to-work restrictions with light duty work and two leaves of absence. After the plant shut down on April 19, Sherman underwent a second surgical procedure and provided updated restrictions in June. *See* Ex. 15, at 3–6. Conagra discussed potential accommodations with Sherman in June and July and explained why those accommodations wouldn't work. *See id.* at 2; *see also* Ex. 11. The company ultimately terminated Sherman later in July. Although the contemporaneous emails discussing Sherman's employment referenced Sherman's work restrictions and requested accommodations, those emails support Conagra's position that the company fired Sherman because it couldn't accommodate Sherman's restrictions, not because Sherman had requested accommodations for them. In other words, the emails support a nonretaliatory reason for the discharge. *See Kotaska*, 966 F.3d at 633 (finding management's references to employee's ongoing restrictions to be the nonretaliatory reason for the employee's discharge); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 865 (7th Cir. 2005) ("[A]n employer is entitled to conclude that termination is warranted solely on the basis of the employee's patent inability to perform his job in manner that meets the essential requirements of that position."). Sherman does not present any evidence suggesting that Conagra's stated reason was pretextual. Indeed, the company consistently told Sherman that it couldn't accommodate their restrictions.

Because Sherman has failed to raise a genuine issue of material fact on causation, Conagra is entitled to summary judgment on Sherman's retaliation claim.

## MOTION FOR SANCTIONS

Conagra also seeks sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure. "Under Federal Rule of Civil Procedure 11, courts may sanction parties who file

26

frivolous pleadings." *Matlin v. Spin Master Corp.*, 979 F.3d 1177, 1181 (7th Cir. 2020). The rule applies to both attorneys and unrepresented parties like Sherman. *See Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 521 (7th Cir. 2020) ("[P]ro se litigants are not excused from the monetary sanctions available under Federal Rule of Civil Procedure 11."). "[F]or Rule 11 purposes a frivolous [claim] is simply one that is 'baseless or made without a reasonable and competent inquiry.'" *Berwick Grain Co. v. Ill. Dep't of Agric.*, 217 F.3d 502, 504 (7th Cir. 2000) (quoting *Indep. Lift Truck Builders Union v. NACCO Materials Handling Grp., Inc.*, 202 F.3d 965, 969 (7th Cir. 2000)).

Conagra asks the court to order Sherman to pay the fees and costs incurred in bringing the company's motions for sanctions and for summary judgment. Conagra contends that Sherman's lack of explanation for the inconsistency between their failure to accommodate claim and their representations to the Social Security Administration renders Sherman's claim frivolous. Similarly, Conagra argues that Sherman's hostile work environment and retaliation claims lack any basis in fact because Sherman admitted during their deposition that the primary reason for the company's conduct was not based on Sherman's disability.

Rule 11 sanctions are not warranted in this case. As explained above, the pursuit and receipt of disability benefits does not estop the recipient from pursuing an ADA claim or trigger a presumption that the recipient is unable to perform the essential functions of her job. *Cleveland*, 526 U.S. at 802–06. An ADA plaintiff can explain away the apparent inconsistency, and a generous reading of Sherman's explanation is that when Sherman claimed they were unable to return to the process control technician position, Sherman was simply saying that they could no longer do that job unless Conagra accommodated him. Moreover, while Sherman believed that Moore's mistreatment primarily stemmed from Sherman's refusal to

27

sign the sanitation certification—which had nothing to do with Sherman's disability—Sherman did offer other potential reasons. Sherman subjectively believed that the walkie talkie incident and Moore's disparaging comments were based on how she perceived Sherman's ADHD. In short, while meritless, Sherman's claims are not frivolous.

## CONCLUSION

Sherman has failed to present evidence from which a reasonable factfinder could rule in Sherman's favor on their claims for failure to accommodate, hostile work environment, and retaliation under the Americans with Disabilities Act. Accordingly, the court **GRANTS** the defendant's motion for summary judgment, ECF No. 56. Those claims, however, were not baseless. Accordingly, the court **DENIES** the defendant's motion for sanctions, ECF No. 62. The clerk of court shall enter judgment that this action is dismissed and that Sherman shall take nothing from the defendant by their amended complaint.

**SO ORDERED** this 31st day of July, 2024.

_Stephen C. Dries_
STEPHEN C. DRIES
United States Magistrate Judge

28